# EXHIBIT A

NATIONAL ARBITRATION AND MEDIATION

VIA EMAIL AND REGULAR MAIL

August 24, 2026

James Serritella, Esq.
Kim & Serritella, LLP
110 W. 40th St, 10th Floor
New York, NY 10018
Email: jserritella@kandslaw.com

Jordan Reece, Esq.
Baughman Kroup Bosse, PLLC
One Liberty Plaza – 46th Floor
New York, NY 10006
Email: mjones@bkbfirm.com

**Re: HOWARD CHEUNG VS. GEMINI TRUST COMPANY, LLC; TYLER WINKLEVOSS AND CAMERON WINKLEVOSS**
**NAM ID No.: 282501**

Dear parties:

Attached please find the Arbitrator's 8/12/26 Decision. The Arbitration is now closed.

If you have any questions, please contact me through written correspondence.

Thank you.

Sincerely,

Marinos Constanti
Account Executive
mconstanti@namadr.com

CASE NO. 282501

| | | |
|---|---|---|
| **HOWARD CHEUNG,** ***Claimant*** | § | **BEFORE NATIONAL** |
| | § | |
| | § | |
| **v.** | § | **ARBITRATION** |
| | § | |
| **GEMINI TRUST COMPANY, LLC, TYLER WINKELVOSS, and CAMERON WINKELVOSS,** ***Respondents*** | § § § | **AND MEDIATION** |

**FINAL AWARD**

I, the undersigned Arbitrator, having been duly designated in accordance with the arbitration provision within the document entitled, "Gemini Users Agreement"entered into by Claimant Howard Cheung and Respondent Gemini Trust Company, LLC[1], on May 21, 2021, and having been duly sworn and having duly heard the proofs and allegations of the parties, and Claimant Howard Cheung, being represented by James Serritella, Lara Chassin, and Johnny Shaw of Kim & Serritella, PC, and Respondents Gemini Trust Company, LLC, Cameron Winklevoss and Tyler Winklevoss, being represented by John Baughman, Andrew Bosse, Emily Bryant-Álvarez, Ernest Butner IV, and Jordan Reece of Baughman, Kroup, Bosse, PPLC, hereby **AWARD** as follows:

**Procedural Background**

1. Claimant Howard Cheung initiated this arbitration proceeding against Respondents Gemini Trust Company, LLC (hereinafter referred to as "Gemini," unless otherwise noted), Cameron Winklevoss and Tyler Winklevoss via a Demand for Arbitration on November 19, 2024. Thereafter, on January 3, 2025, Respondents filed counterclaims against Claimant. On February 17, 2025, the undersigned Arbitrator was appointed to serve in this matter, thereby constituting the "Tribunal." This matter is one of 15 bellwether cases between similarly situated Claimants and the instant Respondents, each side represented by the same Counsel in all matters.

[1] Although Respondents Cameron and Tyler Winklevoss did not sign the Arbitration Agreement in their indivudual capacities, all parties executed an agreement, acknowledging that the claims raised herein involving Cameron and Tyler Winklevoss in their individual capacities were subject to arbitration.

2. On March 18, 2025, the Tribunal held a telephonic (via Zoom) Management Conference in the above-styled matter, attended by James Serritella, Mark Keurian, & Mario Cacciola, as Counsel for Claimant, and Andrew Bosse and Ernie Butner as Counsel for Respondents. On March 18, 2025, the Tribunal signed "Management Conference Order No. 1." On March 27, 2025, the Tribunal signed "Management Conference Order No. 1 (Amended)." Unless a distinction is to be made between the two Orders, the Tribunal will refer to the Orders collectively as "Management Conference Order No. 1." Otherwise, the Tribunal will refer to "Management Conference Order No. 1 (Initial)" and "Management Conference Order No. 1 (Amended)."

3. Management Conference Order No. 1 initially set this matter for final hearing to commence on December 8, 2025, expected to last five days. As discussed below, by the request of the parties, the matter was reset to commence on June 22, 2026. The arbitration agreement provided that the final hearing was to take place in the county of Claimant's residence, being Collin County, Texas. However, on April 9, 2026 the parties later agreed that the final hearing would take place in New York County, New York at the facilities of NAM in midtown Manhattan. Nonetheless, the seat of arbitration remains Collin County, Texas.

4. The parties disagreed on the applicable substantive law concerning some of the claims. After briefing, on April 25, 2025, the Tribunal rendered a decision on the choice of law issue, determining that New York law governed all claims, except for Claimant's Deceptive Trade Practices Act ("DTPA") claim, which was governed by Texas law.

5. The parties disagreed on the applicable fee schedule governing his proceeding. After briefing, on July 12, 2025, the Tribunal rendered a decision on the applicable fee schedule issue, determining that NAM consumer fee schedule applied, but noted that the NAM rules do bestow the Tribunal to reallocate arbitration costs and fees in the final award.

6. Both parties filed motions for dispositive relief (to dismiss), as permitted by the Management Conference Order No. 1. On August 11, 2025, the Tribunal held a hearing via telephonic (via Zoom) hearing on the cross-Motions to Dismiss. In a decision dated August 15, 2026, the Tribunal denied Respondents' Motion to Dismiss Claimant's claims and granted Claimant's Motion to Dismiss Respondents' Counterclaims.

7. The parties disagreed as to whether the final hearing should take place in-person or telephonically, and in a decision dated September 19, 2026, the Tribunal determined that the final hearing would take place in-person. Thereafter, on April 6, 2026 all parties agreed that the matter would take place in-person in New York County, New York, despite the arbitration agreement's provision that the final hearing would take place in Collin County, Texas.

8. After the Tribunal's decision on the Motions to Dismiss, Claimant sought leave from the confidentiality provision governing these proceedings to allow the Tribunal's decision to be shared with arbitrators in the other bellwether cases. In a decision dated September 26, 2025, the Tribunal denied such leave, determining that the Tribunal's decision on the Motions to Dismiss was confidential, and not to be shared with other arbitrators.

9. On October 20, 2025, the parties jointly informed the Tribunal that they desired to reschedule the final hearing date. Thereafter, in a decision dated October 27, 2025, the Tribunal granted the request for continuance to reschedule the matter to commence on June 22, 2026 (the first time available on the Arbitrator's calendar to schedule 5 consecutive hearing days), but that the matter would have to heard in Collin County, Texas, as the Tribunal, at that time, had a scheduling conflict that would have prevented travel to New York. Subsequently, that scheduling conflict resolved, the Tribunal informed the parties of its ability to conduct the final hearing in New York. As mentioned above, on April 9, 2026, the parties agreed to conduct the final hearing in New York City.

10. On May 20, 2026, Claimant sought leave to amend his Statement of Claim, which Respondent opposed. In a decision dated May 24, 2026, the Tribunal granted leave for Claimant to file his Amended Statement of Claim.

11. The parties also disputed whether certain depositions used in other bellwether proceedings could be used in this matter, and whether certain witness testimony (Marshall Beard) at the final hearing could be videotaped. In an email dated June 8, 2026, the Tribunal informed Counsel of its decision on the use of prior testimony, and in an email dated June 17, the Tribunal informed Counsel of it decision to allow the videotaping of the final hearing testimony of Marshall Beard.

11. On June 15, 2026, the Tribunal conducted a telephonic (Zoom) pre-final hearing conference with Counsel to discuss various logistical issues (*e.g.*, form of witness deposition designations, total time allotted per side, *etc.*)

12. The final hearing commenced on Monday, June 22, 2026, lasting through Friday, June 26, 2026, and took place at NAM's offices in mid-town Manhattan, a venue mutually agreed upon by the parties. The following Counsel appeared on behalf of the following: James Serritella, Lara Chassin, and Johnny Shaw of Kim & Serritella, PC on behalf of Claimant, and John Baughman, Andrew Bosse, Emily Bryant-Álvarez, Ernest Butner IV, and Jordan Reece of Baughman, Kroup, Bosse, PPLC on behalf of Respondents Gemini Trust Company, LLC, Cameron Winklevoss and Tyler Winklevoss. The matter was recorded via stenographer Marina Dubson, and certain witnesses' testimony was also videotaped.

13. Claimant pre-marked a total of 387 Exhibits, numbered 6-560, and Respondents pre-marked a total of 568 Exhibits, numbered 1-1466. (The enumeration skipped over several numbers). Claimant withdrew its Exhibits 290, 291, 294, 295, 353, 355, and 356, and the Tribunal sustained Respondents' objections to Claimant's Exhibits 6, 11, 12, and 13.

14. The Tribunal admitted Claimant's Exhibits 354, over Respondents' objections for a limited purpose, which concerned proceedings initiated against Respondents by regulatory authorities, which resulted in an agreed resolution without admissions of liability. The Tribunal did not admit the exhibit to prove the underlying accusations, but did allow witnesses to state whether they agreed or disagreed with the contentions contained therein. Other than the foregoing, the Tribunal admitted Claimant's Exhibits. The Tribunal admitted all of Respondents' Exhibits presented during the hearing[2], except for 425 / 425-A, to which Claimant objected, and which the Respondents withdrew.

15. After both sides presented an opening statement, the following witnesses (all in-person, except for Rob Jones who testified remotely via Zoom) testified in the following order: (i) Marshall Beard (former Gemini employee); (ii) Rob Jones (Claimant's retained expert on damages); (iii) Barry Silbert (CEO of Digital Currency Group); (iv) Cameron Winklevoss (Respondent, broken up by the testimony of Neeraj Mishra); (v) Neeraj Mishra (former Gemini employee); (vi) Kevin Herzberg (Claimant's retained expert on liability); (vii) Howard Cheung (Claimant)' (viii) James Serritella (Claimant's Counsel, on attorneys' fees); (ix) Angelo Chan (Respondents' retained expert); (x) Anson Frelinghuysen (Bankruptcy Attorney for Gemini individually, and as agent for Earn Users). In addition to the foregoing witnesses, the following witnesses offered videotaped testimony, either from depositions, or prior testimony in other bellwether cases with the consent of all parties: (i) Joshua Golebieski (Gemini employee); (ii) Thomas Vaniotis (former Gemini employee); and (iii) Tyler Winklevoss (Respondent)

15. At the conclusion of the evidence, the Tribunal heard closing statements from Counsel for all parties. The parties requested the opportunity to submit post-hearing briefing, which the Tribunal allowed, and which the parties submitted on their agreed upon date, July 24, 2026.

16. After the post-hearing submissions, the Tribunal reviewed its notes, the exhibits, the pleadings, the parties' pre-and post-hearing briefings, and the stenographic transcript of the final hearing. Thereafter, the Tribunal issued this Final Award.

---

[2] During post-hearing submissions, Claimant submitted additional exhibits concerning attorneys' fees. However, post-hearing submission exhibits was not authorized. Moreover, ultimately Claimant did not prevail on its claims, so the issue of its attorneys' fees was largely moot, except for his prevailing on Respondents' counterclaims. However, the post-hearing offers of evidence on attorneys' fees did not segregate and allocate attorneys' fees attributable to prevailing against Respondents' counterclaims, (see below), and thus the issue of these post-hearing exhibits is moot.

## **Factual Background**

*The Parties and the Earn User Program*

17. Respondent Gemini was established by Respondents Cameron & Tyler Winklevoss, who continue to serve as officers of the entity. Since 2015, Gemini has operated an online platform to facilitate retail customers, known as registered users, to buy, sell, trade, and store digital assets ("cryptocurrency" or "crypto"). Starting in February 2021, complimenting its exchange platform, Gemini launched the "Earn Program," whereby Gemini would facilitate users to loan crypto to a third party(ies), who, in turn, would loan the crypto to other third parties. The Earn Program was promoted as an opportunity for holders of crypto to earn interest, whereas traditionally a holder of crypto would only realize a monetary gain either upon the sale of the crypto at an appreciated price, or by "mining" or "staking" the crypto (in simplified terms, increasing ones quantity of crypto via various interactions with the blockchain of crypto transactions.)

18. With the Earn Program, Gemini effectively acted as a kind of broker to facilitate users, such as Cheung, to loan crypto to a third party, which was Genesis Global Capital, LLC (hereinafter referred to as "Genesis," unless otherwise noted), who, in turn would loan the crypto to third parties. Thus, the Users, such as Cheung, were the Lenders, Genesis was the Borrower, and Gemini was the Agent or Custodian of the crypto in the Earn Program. Under the Earn Program, Users were able to redeem their assets at any time. It is worth noting that Gemini principles Cameron and Tyler Winklevoss were also Earn Program Users in their personal capacities, having invested approximately $10 million of their own crypto in the Earn Program. Together, they were the second largest lender by value in the Earn Program.

19. Claimant Cheung has been a registered user with Gemini since 2017, and became a registered user with the Earn Program on May 21, 2021. Although the Earn Program has been discontinued, he continues to hold Gemini accounts to this day. Cheung is a sophisticated real estate investor with a large portfolio of rental properties. Cheung is also a very sophisticated crypto investor who publishes a blog, using the pseudonym "Crypto Ninja," where he advises others on best practices in investing in crypto.

20. To lend through the Earn Program, Cheung, as with all Users, was required to, and did, consummate three separate contracts (collectively, the "Earn Agreements"). First, Cheung consented to the terms and conditions of the Gemini User Agreement (the "User Agreement"), which governed his use of Gemini's platform as well as its products and services. Second, Cheung agreed to the Earn Program Terms and Authorization Agreement (the "Program Terms"), wherein he acknowledged and accepted the Program's risks. Third, Claimant consummated the Master Digital Asset Loan Agreement (the "MDALA"), a three-party contract among Cheung, Gemini, and Genesis setting forth the terms of the loans and the rights and obligations of each party. The MDALA clarified that Genesis, not Gemini, was the sole borrower, and that Gemini's role was limited to that of an agent, authorizing Gemini to deal with Genesis on Claimant's behalf.

21. Gemini conducted periodic risk analyses of the Earn Program. Starting in the spring of 2022, the crypto market entered into, what would become a prolonged downturn, which became known in the industry as the "Crypto Winter." In the summer of 2022, one of Genesis' counter parties, a crypto hedge fund called Three Arrows Capital ("3AC") defaulted on its loans to Genesis. As part of its ongoing risk management analysis, after the 3AC default, Gemini learned that Genesis had a large concentration of its loans to a single borrower, Alameda Research, LLC (hereinafter, "Alameda"). In an effort to mitigate risk to the Earn Program Users, Gemini worked with Genesis: (i) to reduce Alameda's concentration of Genesis' loan portfolio; (ii) to create a risk reserve at Genesis (valued at several hundred million dollars); and (iii) to have Genesis collateralize a portion of its loan portfolio.

*Decision to Wind-Down the Earn User Program*

22. Starting in May 2022, Gemini began an internal management discussion on whether to end the Earn Program, which lasted several months. Specifically, there was a belief that Gemini could make more money staking crypto than by acting as an agent with the Earn Program. Ultimately, in September 2022, Gemini made the internal business decision to phase out the Earn Program, memorialized in the "Steel Goose Memo."

23. As discussed below, Gemini believed that Genesis was solvent at the time, but that there was some inevitable mis-match as to when loans might come due to Genesis from third-parties and when Earn Users may seek to redeem their crypto. If enough Earn Users redeemed their funds before the loans came due to Genesis, there would be cash-flow, but not insolvency, problem. Therefore, Gemini kept the decision to phase out the Earn Program confidential in order to effectuate an orderly wind-down of the program, with all Earn Users to redeem their crypto at a single point in time (the "atomic swap"), thereby avoiding a classic "run-on-the-bank" scenario.

24. On October 13, 2022, Gemini provided Genesis with formal notice that it was terminating the Earn Program, and began to engage with Genesis to plan an orderly wind-down of the program, taking into consideration the expected cash-flow mismatch between Genesis' loan portfolio and the redemption of funds to the Earn Program Users.

25. As part of the discussions between Gemini and Genesis concerning the wind-down of the Earn Program, Cameron Winklevoss met with Barry Silbert, CEO of Digital Currency Group (hereinafter "DCG"), the parent company of Genesis at a lunch meeting on October 20, 2022. Silbert confirmed the expected cash-flow mismatch, but conveyed to Cameron Winklevoss that Genesis was otherwise financially sound, and that absent the Earn Program phasing out too quickly (*i.e.*, if redemptions to Earn Program Users were to be out-of-snyc with its loan portfolio due dates), Genesis was at no risk of insolvency. In fact, Silbert even suggested that Gemini and Genesis merge, as they were both strong companies. As discussed below, Silbert's representations were absolutely untrue, and were part of a massive fraud that he, DCG, and Genesis perpetrated on both Gemini and the Earn Program Users.

*Genesis Defaults and Declares Bankruptcy*

26. After the meeting, Gemini and Genesis continued discussions about an orderly wind-down of the Earn Program. Then, less than a month from the aforementioned meeting, on November 16, 2022, suddenly and without warning, Genesis informed Gemini that it would no longer honor Earn User redemptions. Then, on January 19, 2023, Genesis filed for bankruptcy.

27. Between October 13, 2022 (the day Gemini decided to terminate the Earn Program) and November 16, 2022 (the day Genesis declared it would not honor redemptions), Cheung deposited various crypto (.05489486 BTC, 6.31198196250143 ETH, $ 1272.435037 XTZ, and 12.391184 SOL) into his Earn account. Gemini accepted these deposits into the Earn Program and forwarded them to Genesis in the same manner as they had been since the inception of the program.

28. For the next 18 months, Gemini sought to recover funds in the bankruptcy proceedings on behalf of the Earn Program Users. Ultimately, Gemini spent tens of millions of dollars in legal fees, and contributed approximately one hundred million dollars of its own funds to effectuate a bankruptcy settlement with Genesis, such that the Earn Users received 100% recovery coin-for-coin of their principal (which had greatly appreciated in value – over 200% – from the time of the redemption freeze to recovery of the assets). The Earn Users did not recover the expected interest on their investments (time value of money) had the redemptions not been frozen.

*Fraud by DCG and Barry Silbert*

29. While many of the aforementioned events were taking place, Silbert, DCG, and Genesis were perpetrating a massive fraud on both Gemini and the Earn Program Users. After the 3AC default, Genesis sustained a loss exceeding one billion dollars, which exceeded its equity by several hundred million dollars. On June 13, Silbert received the proverbial "dreaded" phone call at 2:00am informing him that 3AC had defaulted, resulting in Genesis sustaining unsecured exposure of roughly $500 million in losses. Silbert's reaction was to conceal this economic catastrophe.

30. On June 15, 2022, Genesis shared publicly—in a Twitter post—that "the Genesis balance sheet is strong and our business is operating normally." This was false, as Mr. Silbert testified that Genesis needed financial assistance as of June 15, 2022. Cameron Winklevoss testified that Gemini relied on this statement as he shared this tweet with senior leadership at Gemini. Despite Genesis' dire straits, on June 17, 2022, Genesis' representatives told the Gemini team that "Genesis remains solvent and operates as BAU at the moment."

31. Also on June 17, 2022, Genesis' CEO Michael Moro tweeted, "we have shed the risk and moved on." This, too, was false, as three days later, on June 20, Genesis' Matt Ballensweig sent an email about "rais[ing] equity to plug this hole" left by the 3AC default. At trial, Mr. Silbert could not explain how Mr. Ballensweig's search for capital was consistent with Moro's statement that Genesis had "shed the risk and moved on."

32. In the middle of the summer of 2022, in a group chat among DCG and Genesis management, on June 26, 2022, Silbert wrote, "I look forward to hearing how you guys plan to address the fundamental question – should Genesis be saved and why?"

33. At the aforementioned October 20, 2022 lunch meeting with Cameron Winklevoss, Silbert did not tell him the truth that Genesis was insolvent and desperately trying to raise cash. A few weeks later, on November 9, 2022, Mr. Silbert texted another DCG board member, stating, "we don't have a great solution to avoid a Genesis bankruptcy."

34. To further compound Genesis' problems, by early November 2022, FTX, a leading player in the crypto industry (and a sister-company to Alameda) essentially collapsed and had defaulted on its Genesis loans, with Alameda and FTX having filed for bankruptcy on November 11, 2022.

35. Perhaps the biggest fraud Silbert perpetrated was deliberately falsifying Genesis' financial statements. On June 30, 2022, Silbert signed, on behalf of DCG, a promissory note payable to Genesis in the amount of $1.1 billion, payable in ten years with interest at 1% *per annum*. Then, on the same date, Genesis prepared a financial statement reflecting this promissory note, at full face value, as a current asset. Of course, even assuming that DCG ever intended to be liable to Genesis (which the subsequent bankruptcy proceedings reveal that it did not) the present discounted value of $1.1 billion note payable in ten years time is nowhere near $1.1 billion. Genesis then shared this falsified financial statement with Gemini in order to deceive Gemini into believing that Genesis was solvent and financially stable, when it was not.

36. After the November 16, 2022 freeze on redemptions, and during the course of the bankruptcy, Gemini came to learn of the fraud perpetrated by Silbert, DCG and Genesis. Until the fraud was discovered by Gemini, it went undetected by Genesis' & DCG's auditors, as well as by various regulatory authorities.

**Parties' Claims & Contentions**

*Claimant's Claims*

37. Claimant brings sixteen causes of action against the various Respondents: (1) fraud; (2) fraudulent inducement; (3) fraudulent concealment; (4) aiding and abetting fraud; (5) civil conspiracy; (6) breach of fiduciary duty; (7) participating in and aiding and abetting breach of fiduciary duty; (8) negligent misrepresentation; (9) negligence; (10) gross negligence; (11) negligent infliction of emotional distress ("NIED"); (12) violation of New York General Business Law § 349 (hereinafter "§349 claim"); (13) unjust enrichment; (14) money had and received; (15) promissory estoppel; and (16) violations of the Texas Deceptive Trade Practices Act (hereinafter, "DTPA"). All of these claims are governed by New York Law, except for the DTPA claim, which is governed by Texas law.

38. These claims can be further categorized into further "silos:" (1) tort claims requiring a "*scienter*" (claims #1-7, 12, and 16 above); (2) negligence claims (claims #8-11 above); and (3) quasi-contractual claims (claims #13-15).

*Respondents' Defenses and Counterclaims (since dismissed)*

39. Respondents generally deny that they had the requisite *scienter* for any of the *scienter* claims, nor that they were negligent, concerning the negligence claims. Concerning the quasi-contractual claims, Respondents argue that the existence of a contract between Claimant and Gemini bars any such claims. Respondents also argue that the evidence did not prove causation.

40. Respondents also raise other affirmative defenses, *viz.* that Claimant assumed the risk and/or was comparatively negligent. Respondents also contest Claimant's damages, arguing that his damage model seeks recovery of principal which was restored, and that the Bankruptcy Court's decision bars recovery of the damages sought. Finally, Respondents contest Claimant's request for attorneys' fees, arguing that he did not prevail, that the fees were not reasonable and/or necessary (at least in part), and that to the extent that he did prevail in dismissing Respondents' counterclaims, Claimant failed to segregate and apportion the amount of fees attributable to that success.

41. As mentioned previously, Respondents filed counterclaims essentially allege that Claimant has breached the relevant contracts with Respondents, and the Tribunal has already dismissed those counterclaims by way of dispositive motion, which relief is incorporated herein.

## **Analysis of the Issues**

### ***Scienter Claims***

42. Claimant's claims #1-7, 12, and 16 (as referenced above) all require some sort of *scienter*, *viz.* intentional or knowing conduct which is deceitful, fraudulent, deceptive, or which otherwise constitutes wrongdoing. In essence, Claimant relies upon three "buckets" of alleged misrepresentations and omissions to support his *scienter* claims: (i) alleged affirmative misrepresentations before Cheung joined the Earn Program (*i.e.*, statements made via the website); (ii) alleged affirmative misrepresentations made after Cheung joined the Earn Program; and (iii) alleged material omissions made after Cheung joined the Earn Program. The Tribunal will address these allegations *in seriatim*.

*Alleged affirmative misrepresentations* *before* *Cheung joined the Earn Program*

43. Claimant's claims of affirmative misrepresentations before he joined the Earn Program stem from the following language on the Gemini website:

> Gemini partners with accredited third-party borrowers like Genesis, who are vetted through a risk management framework that reviews our partners' collateralization management process. Additionally, on a periodic basis we conduct analys[is] of our partners' cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners.
>
> ...........
>
> Unlike other opportunities to earn interest on your crypto holdings, you can redeem and move your cryptocurrency back to your trading account (plus interest) at any time, with no minimums, and no transfer or redemption fees.

44. In sum, Cheung claims that these were false and deceptive because: (i) Gemini did not "rigorously vet" the borrowers; (ii) the term "accredited" is deceptive and/or meaningless; (iii) the language suggested there were more than one borrower, when there was only one (Genesis); and (iv) he ultimately was not able to redeem his crypto.

45. Cheung testified at the final hearing that he considered these to be material misstatements upon which he relied, insisting he would not have invested in the Program had he known these statements were untrue or misleading. However, the Earn Agreements, which Cheung signed made clear the precise nature of the roles that Users (as lenders), Genesis (as a borrower), and Gemini (as an agent) played. These Agreements made clear that there was only one borrower (Genesis), and discussed that, while the program contemplated that Earn Users could redeem funds at any time, if they were unable to do so, this would be the fault of Genesis, not Gemini. As mentioned above, Cheung is a sophisticated investor, and the Tribunal believes that, despite his denials, he knew and understood what was in the detailed disclosures.

46. In his deposition testimony, Cheung also testified that he did not rely on the statements that he later claimed at the hearing to rely upon, such as whether Genesis was "accredited" or "collateralized" and whether there were other borrowers. Given the inconsistencies in Cheung's pretrial deposition testimony & his final hearing testimony, and his sophistication as an investor (and therefore that he certainly read and understood the clarifications in the Earn Agreements), the Tribunal does not find his final hearing testimony about being mislead to be credible. Cheung read the disclosures in the Earn Agreements, understood them, did not rely on what he contends were misrepresentations, and feigned ignorance about who was the borrower (Gemini versus Genesis). Assuming *arguendo* that the statements on the website were in any way false or misleading (which they were not), Cheung, a self-described crypto-ninja, did not rely on them. Therefore, he cannot rely on any alleged misstatements before joining the Earn Program to support any of his *scienter* claims.

*Alleged affirmative misrepresentations <u>after</u> Cheung joined the Earn Program*

47. Claimant's claims of affirmative misrepresentations after he joined the Earn Program are based on: (i) statements made in a November 9, 2022 tweet and a November 14, 2022 email to Earn Users concerning Gemini's lack of exposure to Alameda / FTT tokens and lack of material exposure to FTX; and (ii) a statement by a Gemini employee in a February 2, 2021[3] trade publication article that Genesis' loans were overcollateralized.

48. Respondents' statements concerning Gemini's lack of exposure, and/or material exposure, to the Alameda and FTX collapse were not false, and certainly not materially false. Silbert, and the analysis of DCG's expert witness in the New York Attorney General action against DCG and Silbert confirmed the truthfulness of Respondents' statements. In her report, which was admitted as an exhibit in this proceeding, Dr. Maureen M. Chakraborty demonstrated that by November, Genesis "had eliminated its direct loan and collateral exposure to Alameda and had insignificant exposure to Alameda, FTT, and FTX at the time of the FTX collapse." Given that these statements were not false, they cannot support any of Claimant's *scienter* claims.

49. Concerning the statement quoted in the trade publication article about Genesis' loans being overcollateralized, there was no evidence that Cheung saw the article and therefore relied on it. Without any reliance, such statements cannot support any of the *scienter* causes of action, which is an express element of the various permutations of fraud claims, and at least an implied element (attendant to causation) in the NY and TX consumer protection statute causes of action (§349 & DTPA claims), and the breach of fiduciary duty claims (assuming, *arguendo,* that a fiduciary relationship existed). Therefore, this statement also cannot support any of Claimant's *scienter* claims.

[3] This article was dated before Cheung joined the Earn Program, but is discussed herein, because the parties addressed it in this post-joining Earn Program "bucket" of alleged misrepresentations.

*Alleged material omissions made after Cheung joined the Earn Program*

50. Claimant's theory of his *scienter* claims based upon alleged material omissions made after he joined the Earn Program center upon allegations that Respondents knew that the Earn Program loan portfolio was in peril, yet hid this information from him. However, as discussed above, Silbert, DCG and Genesis perpetrated a massive fraud on Gemini, and, in turn, the Earn Users. Gemini did not act with any *scienter* concerning the Genesis fraud, as Gemini was duped and just as much a victim as the Earn Users.

51. Claimant also argues that, apart from the Silbert / DCG / Genesis fraud, Gemini knew that the Earn Program was in jeopardy of default, claiming that Gemini believed that the Genesis' loan portfolio was equivalent to "junk value." This is a mischaracterization of the evidence. Gemini conducted ongoing risk assessments of the Genesis loan portfolio, assuming a variety of hypothetical scenarios. There was an analysis of the risk assuming a CCC credit rating (*i.e.*, junk status), but that did not mean that Gemini considered the loan portfolio to be junk status. Crypto is a relatively new form of investment, and while it did share some features consistent with junk status credit rating, Gemini did not consider Genesis' loan portfolio to be junk rated, largely because it attracted very key players in the industry as lenders (*e.g.,* Mark Cuban, Marcelo Claure, *etc.*), had never defaulted, and was backed (or reasonably believed to be backed) by an incredibly solvent parent (DCG).

52. Finally, Claimant argues that the secrecy behind the Steel Goose Memo is evidence that Respondents were inappropriately hiding information from Earn Users. On the contrary, by keeping the wind-down of the Earn Program confidential, Respondents were protecting Earn Users by preventing a "run-on-the- bank" scenario.

53. The evidence, taken as a whole, demonstrates that Gemini conducted a diligent risk analysis of the Genesis loan portfolio, took appropriate measures when needed (such as "deconcentrating" the Alameda share of the portfolio, and requiring Genesis to establish risk reserves and provide collateral), decided to terminate the Earn Program for reasons unrelated to Genesis' eventual collapse, and were defrauded by Silbert, DCG, and Genesis. In sum, Respondents had nothing to hide, and therefore their actions do not support any of Claimant's *scienter* claims premised on omissions of material facts.

54. Briefly turning to Claimant's breach of fiduciary duty claims, the parties disagreed as to whether the Respondents' owed Claimant a fiduciary duty. Even assuming, *arguendo*, that they did, as the foregoing discussion demonstrates, Respondents did not breach any such duty, and even if they did, such breaches did not cause any loss to Claimant, as he failed to prove reliance.

55. In conclusion, in analyzing Claimant's *scienter* claims, one must remember that the Winklevosses personally lost $10 million as investors in the Earn Program. Often, when seeking to ascertain the identity of those who have committed malfeasance, one asks the question, *"cui bono*?" Conversely, rarely, if ever, is the answer to the question, *"cui malo?"* the perpetrator of a hoax. Consequently, all of Claimant's *scienter* claims fail.

***Negligence Claims***

56. Claimant's claims #8-11 (as referenced above) allege various forms of negligence on the part of Respondents.

*Negligent Misrepresentation*

57. Claimant's negligent misrepresentation claims suffer from the same defects as his fraud claims, *viz.* the allegedly false statements were either actually true and/or Claimant did not rely on them. Therefore, whether the applicable culpable mental state is intentional, in the case of fraud, or negligence, in the case of negligent misrepresentation, matters not because of the truthfulness of the statements and/or Claimant's lack of reliance. Accordingly, Claimant's negligent misrepresentation claims fail.

*Negligence and Gross Negligence*

58. Even if Respondents did not act with the requisite *scienter*, did their negligence cause Claimant's losses? In other words, did Respondents inadequately monitor and assess Genesis' risk potential and/or did Respondents unreasonably fail to discover the Silbert / DGC / Genesis fraud before it was too late? The answer to both these questions is no.

Alleged Inadequacy in Monitoring and Assessing Genesis' Risk Potential

59. Before launching the Earn Program Gemini performed appropriate due diligence in a "lender -to-lender" scenario, including obtaining information regarding Genesis' risk management framework and philosophy, asset liability management, and anti-money laundering procedures. Gemini also received documents from Genesis, such as Genesis' counterparty due diligence form, sample master loan agreement, and financial statements.

60. During the course of the Earn Program, Gemini maintained an adequate ongoing risk assessment and management of Genesis, including increasing the frequency of risk monitoring, conducting stress testing and scenario analyses, reducing the concentration of Alameda in Genesis' loan portfolio, requiring Genesis to post collateral, and creating a liquidity reserve.

61. At the conclusion of the Earn Program, as discussed herein, Gemini acted reasonably in planning an orderly wind down in order to avoid a "run-on-the-bank" scenario. One of Claimant's accusations is that between October 13, 2022 (the day Gemini decided to terminate the Earn Program) and November 16, 2022 (the day Genesis declared it would not honor redemptions), Gemini continued to accept Earn Users' deposits into the Earn Program and forwarded them to Genesis in the same manner as they had been since the inception of the program. This action forms the basis of Claimant's strongest argument of negligence on the part of Respondents. However, on closer examination, this theory of negligence liability fails as well. If Gemini were to have failed to continue accepting Earn User deposits after October 13, 2022, such action would likely have triggered a "run-on-the-bank." Only with the benefit of hindsight, might one argue that Gemini should have accepted the Earn User deposits, but then simply have "sat on them," and not turn them over to Genesis. As discussed herein, Gemini was unaware that Genesis was insolvent and was perpetrating a massive fraud. Gemini reasonably believed that Genesis was ultimately able to repay the funds, but simply needed some time to do so due to cash-flow mismatch between Genesis' loan portfolio and the redemption of funds to the Earn Program Users. Under these circumstances and with this reasonably held belief, Gemini was not negligent in failing to change the status quo, which it reasonably believed was the prudent course of conduct to work with Genesis to secure it time to repay all the loans and to effectuate the "atomic swap."

Failure to Discover the Silbert / DGC / Genesis Fraud

62. As discussed herein, the scope of the Silbert / DGC / Genesis fraud was massive, and until the fraud was discovered by Gemini, it went undetected by Genesis' & DCG's auditors, as well as by various regulatory authorities. Cameron Winklevoss personally met with Silbert, the principal of Genesis' parent company, who lied to him about Genesis' solvency. Silbert caused Genesis to present Gemini with deliberately falsified financial statements. The evidence failed to prove that Respondents were unreasonable in failing to uncover the fraud.

63. Accordingly, Claimant's negligence and gross negligence claims fail.

*Negligent Infliction of Emotional Distress*

64. To succeed in a claim for negligent infliction of emotional distress, a claimant must prove: (i) a breach of a duty owed to the claimant; (ii) emotional harm; (iii) a direct causal connection between the breach and the emotional harm; and (iv) circumstances providing some guarantee of genuineness of the harm. Francis v. Kings Park Manor, Inc., 992 F.3d 67, 81 (2d Cir. 2021); Ornstein v. New York City Health & Hosps. Corp., 10 N.Y.3d 1, 6 (2008). The fourth element is calculated to guard against "the danger of vexatious suits and fictitious claims" stemming from the fact that "mental disturbance is easily simulated." Delaney v. HC2, Inc., 761 F.Supp.3d 641, 674 (S.D.N.Y. 2025) (alteration in original) (quoting Ferrara v. Galluchio, 5 N.Y.2d 16, 21 (1958)).

65. A plaintiff may satisfy this fourth element in two ways: (i) by alleging and proving that the breach "endangered the plaintiff's physical safety or caused [him] to fear for his . . . physical safety," or, (ii) by alleging and proving special circumstances, a much more rare alternative concerning a "particular type of negligence [that] is recognized as providing an assurance of genuineness, as in cases involving the mishandling of a corpse or the transmission of false information that a parent or child had died." Taggart v. Costabile, 14 N.Y.S.3d 388, 396 (2d Dep't 2015).

66. In the instant case, Claimant offered no evidence of an actual or perceived threat to his physical safety. Moreover, as the aforementioned review of the evidence demonstrates, this case did not involve the type of extreme special circumstances (such as mishandling of a corpse, *etc.*) that can support such a claim. Accordingly, Claimant's negligent infliction of emotional distress claims fail.

***Quasi-Contractual Claims***

67. Claimant's claims #13-15 (as referenced above) allege various quasi-contractual claims (unjust enrichment, money had and received, and promissory estoppel) against Respondents. Under well-settled New York law, when a valid contract governs the subject matter of the claims, one may not recover in quasi-contract. Such claims may only be brought in the absence of such an express agreement. *See* Valelly v. Merril Lynch, Pierce, Fenner & Smith Inc., 464 F.Supp.3d 634, 639 (S.D.N.Y. 2020).

68. In the instant case, the Earn Agreements govern the subject matter of Claimant's claims, and therefore preclude these claims. As such, Claimant's quasi-contract claims fail as well.

**Attorneys' Fees**

69. Claimant failed to prevail on any of his claims for affirmative relief, and is therefore not entitled to recover attorneys' fees as a prevailing party on such claims. However, Claimant was successful in dismissing Respondents' counterclaims via dispositive motion. Section XI of the MDALA provides that a prevailing party on a claim to enforce a provision of the MDALA is entitled to recover attorneys fees. ("If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.")

70. Claimant contends that Respondents' breach of contract counterclaim was based upon a breach of the MDALA, that Claimant successfully defeated this counterclaim, and thus, as a prevailing party on Respondents' breach of contract counterclaim, he is entitled to recover attorneys' fees. Assuming, *arguendo*, that Respondents' breach of contract counterclaim were predicated on the MDALA[4], Claimant has failed to segregate and apportion the amount of attorneys' fees incurred for prevailing on this counterclaim from the rest of the attorneys' fees he incurred in this case. Therefore, Claimant's claim for attorneys' fees as a prevailing party on Respondents' breach of contract counterclaim fails for lack or proof.

**Costs**

71. As discussed herein during the reference to Respondents' motion concerning the applicable fee schedule, this matter is governed by the Consumer fee schedule (meaning that Respondents are to bear the administrative costs of NAM and the costs of arbitrator compensation and expenses), but the Tribunal does have discretion to reallocate such costs, pursuant to NAM Comprehensive Dispute Resolution Rule 34(B).

72. The Tribunal sees no reason to reallocate costs in this matter, and therefore, the administrative costs of NAM and the costs of arbitrator compensation and expenses are to be borne as incurred.

**Relief**

In light of the foregoing, the Tribunal, hereby grants the following relief:

73. Claimant's Claims: Claimant Howard Cheung's claims are denied in full, and Claimant Howard Cheung takes nothing against Respondents Gemini Trust Company, LLC, Cameron Winklevoss and Tyler Winklevoss.

74. Respondents' Counterclaims: The counterclaims of Respondents Gemini Trust Company, LLC, Cameron Winklevoss and Tyler Winklevoss are denied in full, and Respondents Gemini Trust Company, LLC, Cameron Winklevoss and Tyler Winklevoss takes nothing against Claimant Howard Cheung.

75. (Arbitration Costs & Fees) The administrative fees and expenses of NAM and compensation and expenses of the Arbitrator shall be borne as incurred.

76. This Award fully resolves all claims (and counterclaims) submitted to this Arbitration. All claims not expressly granted herein, are hereby **DENIED**.

[4] Respondents' breach of contract counterclaim references the User Agreement and the Program terms, not the MDALA. Claimant has not pointed out a prevailing party attorneys' fee provision in the User Agreement or the Program Terms.

SIGNED and ENTERED on this 12th day of August, 2026.
deemed signed in Collin County, Texas

Carl Ginsberg

The Hon. (Fmr.) Carl Ginsberg, Arbitrator

The Arbitrator herein, Hon. (Fmr.) Carl Ginsberg, affirms that I am the sole arbitrator of the Tribunal in this Arbitration, and that I issued this Final Award, dated August 12th , 2026, and deemed signed in Collin County, Texas, in the matter styled, Howard Cheung v. Gemini Trust Company, LLC, and Tyler Winklevoss and Cameron Winklevoss, NAM Case Number 282501.

Carl Ginsberg

The Hon. (Fmr.) Carl Ginsberg, Arbitrator